**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CATHERINE D. VAN HOLLAND,

            Plaintiff,

    v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social
Security,

           Defendant.

Case No. SACV 16-1169 (SS)

**MEMORANDUM DECISION AND ORDER**

**I.**

**INTRODUCTION**

    Catherine D. Van Holland ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (the "Commissioner" or "Agency") denying her application for Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the

---

[1] Nancy A. Berryhill, Acting Commissioner of Social Security, is substituted for her predecessor Carolyn W. Colvin, whom Plaintiff named in the Complaint. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

jurisdiction of the undersigned United States Magistrate Judge. (Dkt. Nos. 9, 10). For the reasons stated below, the Court AFFIRMS the Commissioner's decision.

## II.
### PROCEDURAL HISTORY

On February 17, 2012, Plaintiff filed an application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act alleging a disability onset date of December 5, 2011. (AR 173-79). The Commissioner denied Plaintiff's application initially and on reconsideration. (AR 92-95, 101-06). Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (AR 114), which took place on May 21, 2014. (AR 34-60). The ALJ issued an adverse decision on September 2, 2014, finding that Plaintiff was not disabled because she could perform her past relevant work. (AR 16-28). On May 6, 2016, the Appeals Council denied Plaintiff's request for review. (AR 1-4). This action followed on June 23, 2016.

## III.
### FACTUAL BACKGROUND

Plaintiff was born on July 26, 1958. (AR 37, 173). She was just over fifty-three years old on the alleged disability onset date of December 5, 2011, and almost fifty-six years old when she appeared before the ALJ on May 21, 2014. (AR 16). Plaintiff attended college for three years, but did not obtain a degree. (AR

38).  She is married and has one son from a prior marriage, who was sixteen years old at the time of the hearing.  (AR 38).  Plaintiff previously worked as a secretary and office manager.  (AR 49-50).

Plaintiff receives long-term disability payments of $2,024.00 per month through a Met Life Disability Insurance policy, though she did not know when the payments would end.  (AR 39).  As summarized by the ALJ, Plaintiff's DIB application alleges disability due to: degenerative disc disease of the cervical (neck) and lumbar (low back) spine; spinal stenosis;[2] failed cervical spine fusion; pseudoarthrosis;[3] diverticulitis;[4] ventral hernia repair surgery;[5] carpal tunnel syndrome; left ulnar shortening

---

[2]  Spinal stenosis causes narrowing in the spine.  (See https://medlineplus.gov/spinalstenosis.html).  "The narrowing puts pressure on the [patient's] nerves and spinal cord and can cause pain."  (Id.).

[3] Pseudarthrosis (variation pseudoarthrosis) occurs "[w]hen a solid fusion is not obtained after fusion surgery," (see https://www.spine.org/KnowYourBack/Resources/Definitions.aspx), and "a false joint grows at the site." (See https://medlineplus.gov/ency/article/007383.htm).

[4] Diverticulitis is an "inflammation or infection of a diverticulum [pouch or sac] of the colon that is marked by abdominal pain or tenderness often accompanied by fever, chills, and cramping." (See http://c.merriam-webster.com/medlineplus/diverticulitis).

[5] Plaintiff states that the hernia repair surgery was due to complications from a colectomy, which she underwent to treat her diverticulitis.  (AR 242).  A colectomy is "surgery to remove all or part" of the large bowel. (See; https://medlineplus.gov/ency/article/002941.htm).

surgery;[6] thrombocytopenia;[7] diabetes; neuropathy of the feet;[8] kidney damage; hemolytic anemia;[9] calcified granulomas;[10] depression; chronic pain and gastrointestinal distress; fatigue;

---

[6] The ulna is "the bone on the little-finger side of the human forearm that forms with the humerus the elbow joint and serves as a pivot in rotation of the hand." (See http://c.merriam-webster.com/medlineplus/ulna). Osteoplasty is "plastic surgery on bone; especially: replacement of lost bone tissue or reconstruction of defective bony parts." (See http://c.merriam-webster.com/medlineplus/osteoplasty). Ulnar shortening osteoplasty is a "shortening of [the] carpal bone" in the wrist. (See http://bioportal.bioontology.org/ontologies/CPT?p=classes&conceptid=25394).

Ulnar shortening is distinct from a "carpal tunnel release," during which "a surgeon makes an incision in the palm of [the patient's] hand over the carpal tunnel ligament and cuts through the ligament to relieve pressure on the median nerve." (See http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/multimedia/carpal-tunnel-release/img-20008129). At the May 21, 2014 ALJ hearing, the ALJ observed that Plaintiff still had not had a "carpal tunnel release." (AR 44).

[7] Thrombocytopenia is "any disorder in which there is an abnormally low amount of platelets. Platelets are parts of the blood that help blood to clot. This condition is sometimes associated with abnormal bleeding." (See https://medlineplus.gov/ency/article/000586.htm).

[8] "Diabetic neuropathy is a peripheral nerve disorder caused by diabetes or poor blood sugar control. The most common types of diabetic neuropathy result in problems with sensation in the feet. . . . The symptoms are numbness, pain, or tingling in the feet or lower legs." (See https://www.ninds.nih.gov/Disorders/All-Disorders/Diabetic-Neuropathy-Information-Page).

[9] Hemolytic anemia is a "condition in which red blood cells are destroyed and removed from the bloodstream before their normal lifespan is over." (See https://www.nhlbi.nih.gov/health/health-topics/topics/ha).

[10] "A granuloma is a clump of cells that forms when the immune system tries to fight off a harmful substance but cannot remove it from the body." (See https://medlineplus.gov/ency/article/001251.htm).

4

medication side effects; inability to sit or stand for prolonged periods; and difficulty using hands.  (AR 23).

A.   **Plaintiff's Testimony**

Plaintiff testified that the only reason that she cannot work is because of her "debilitating pain."  (AR 41).  She stated,

> [M]y pain stems from all my spinal conditions, my bone
> issues, anywhere from my neck to my thoracic spine to my
> lower spine, down to my legs.  My arms are affected.  I
> don't sleep. . . . Even with sleep aids, . . . I never
> stay asleep because I'll wake up in pain.  I can never
> get in a comfortable position.  So as far as the pain
> goes, it really is truly unrelenting.  The medication
> helps me, but nothing ever takes it away.  It's constant.

(AR 53).  Plaintiff stated that even sitting is painful and the only relief she finds is in laying down on an adjustable bed.  (AR 54).  She claimed not be healthy enough at present to undergo the additional "spinal fusion surgery and the carpal tunnel surgery and all the other surgeries [she is] going to have to face" in the future.  (AR 55).

To treat her pain, Plaintiff takes Vicodin two to six times a day, as well as Soma, another pain reliever.  (AR 41).  Plaintiff's daily prescription medications include Atenolol (hypertension),

Lisinopril (hypertension), Metformin (diabetes), and Onglyza (diabetes). (Id.).

Plaintiff stated that she suffers from diverticulitis and fatty liver. (AR 55). She still has "a lot of issues from [her] colectomy," including complications from a hernia. (AR 56). Plaintiff still wears a binder, and while the hernia is better, "it is still very painful." (Id.).

Plaintiff also claimed to suffer from numbness in her arms. She testified that her right arm is "completely numb" "all the time." (Id.). While she admitted that her left arm is not quite as numb as her right, it is still "very painful." (Id.). Plaintiff has discussed carpal tunnel surgery with her doctors.

**B.** **Plaintiff's Statements**

Plaintiff filed a long term disability application with Met Life in September 2012. (AR 518-540). In the application, Plaintiff stated that "[b]oth hands and wrists are so painful that doing basic household chores and personal hygiene are difficult." (AR 522). Plaintiff described her activities of daily living as follows:

> I usually start my day between 6:30 and 7:00 a.m. I
> take my morning medication and begin with doing
> approximately 10 to 20 minutes of riding slowly on the
> recumbent stationary bike to loosen my muscles for my

physical therapy stretches.  I then perform 20 to 30
minutes of Physical Therapy neck and back exercises
. . . . I then use ice and electro stimulation therapy
for another 15 to 20 minutes.  After my P.T. workout I'm
usually quite sore and will watch some TV or read or
sometimes lay down for a bit.  I then try to do any small
chores like light dusting which involves no bending or
lifting.  I can't do laundry or vacuuming because it's
just too tough on hands, wrist and back.  My husband
helps me prepare dinner and my son helps with the
cleaning of dishes, like unloading and loading the
dishwasher[,] which is very hard for me to do.

(AR 526).  Plaintiff states that she does housework, like doing
the dishes, every day so long as she does not have to bend.  (AR
531).  While Plaintiff shops for groceries, her husband or son must
accompany her "to push the cart & load & unload groceries."  (Id.).
Plaintiff claimed that because it is hard to sit in "church seats,"
she watches "the services on line at home so I can stop & restart
when I need to take a break.  (AR 529).

C.  **Treatment History**

    1.  **Diabetes**

    Plaintiff was diagnosed with diabetes well before her December
2011 disability onset date.  (See, e.g., AR 522 (Met Life long term
disability application dated September 14, 2012 in which Plaintiff

claimed to have been diabetic for twenty years).  On January 16, 2012, and again on March 9, 2012, Plaintiff's primary care physician, Dr. Nadia Elihu, M.D., reported that Plaintiff's diabetes remained controlled and that Plaintiff "does not have neuropathy."  (AR 301, 329).  However, on July 3, 2012, Dr. N. Menaka De Silva of the Pavillion Neurology Medical Group, Inc. reported that Plaintiff had a "near global absence of sensory responses in the lower extremities," which was "consistent with a diabetic axonal neuropathy."[11]  (AR 717).  In addition, on January 14, 2013, Dr. Elihu noted that Plaintiff's diabetic control was worse, and that Plaintiff had not only "gained 20 lbs since [she] started cymbalta, but [also] had gained 20 lbs prior to that, too. [Plaintiff] admits to poor eating."  (AR 557).

Nonetheless, by December 14, 2013, Plaintiff's endocrinologist, Dr. John W. Geier, M.D., reported that Plaintiff had gained "good overall control" over her diabetes using oral medications and insulin therapy.  (AR 1087).  At that time, Plaintiff's "diabetic therapy was adjusted to Actos 30mg, Nesina 25mg, and Glumetza 1000mg."[12]  Dr. Geier reported in both January

---

[11] Plaintiff stated in her September 2012 Met Life long term disability application that she finds it "hard to control my blood sugars due to all the cortisone injections & stress my body is going through.  I'm cutting way back on everything, but still having issues."  (AR 527).

[12] These three drugs are oral diabetes medications.  Actos is the trademark name of pioglitazone, "a thiazolidine derivative taken orally . . . to treat type 2 diabetes by decreasing insulin resistance."  (See  http://c.merriam-webster.com/medlineplus/ pioglitazone).  "Nesina (alogliptin) is an oral diabetes medicine that helps control blood sugar levels . . . by regulating the levels of insulin your body produces after eating."  (See

and April 2014 that Plaintiff maintained "good control" over her diabetes. (AR 1085-86).

## 2. Thrombocytopenia

On October 15, 2010, oncologist Dr. Timothy E. Byun, M.D. diagnosed Plaintiff with chronic moderate thrombocytopenia, noting that Plaintiff reported easy bruising of the arms and legs. (AR 491). On November 3, 2011, Dr. Byun cleared Plaintiff for her neck surgery scheduled for December 5, 2011, noting that "[c]urrently the patient is feeling well. She denies any problem with blood sugar control, edema, or facial swelling." (AR 486). On August 7, 2012, Dr. Byun cleared Plaintiff for carpal tunnel surgery, noting "[w]ith her current platelet count, the patient should be able to tolerate carpal tunnel release surgery without increased risk of bleeding complication." (AR 485). Plaintiff denied "any bleeding or bruising problems" at that time. (Id.).

Plaintiff continued her treatment for thrombocytopenia with Dr. Edward A. Wagner, M.D. On December 5, 2013, Dr. Wagner noted that Plaintiff "describe[d] to [him] clearly that she [has] never had any major bleeding or hemorrhage spontaneously and all her surgeries that she's had documented have not resulted in any bleeding or hemorrhage or transfusion of red cells or platelets."

https://www.drugs.com/nesina.html). Glumetza is the trademark name of metformin, an oral drug that "works by helping to restore your body's proper response to the insulin you naturally produce." (See http://www.webmd.com/drugs/2/drug-144868/glumetza-oral/details).

(AR 1048). Dr. Wagner cleared Plaintiff for hernia surgery, stating, "As long as her platelet count is over 50,000, the other studies are unremarkable and [if] she discontinues the medications [with a risk of causing bleeding, such as aspirin], her bleeding risk during ventral hernia repair is minimal but not normal." (AR 1052). Dr. Wagner specifically noted in his exam that Plaintiff's upper and lower extremities on both sides were of "normal strength and tone," and that her mobility and gait were likewise normal. (AR 1050-51).

On April 3, 2014, Dr. Wagner noted that there were "no major complications" and "no bleeding episodes" from Plaintiff's hernia operation on January 27, 2014, (AR 1044), and observed once again that Plaintiff's upper and lower extremities were normal in strength and tone, and that her gait was normal. (AR 1046). Dr. Wagner determined that there was "[n]o need for any treatment at this time," and that he would see Plaintiff again in nine months. (AR 1047).

### 3. Neck Fusion Surgery

On May 19, 2009, Plaintiff consulted with orthopedist Dr. Jeffrey E. Deckey, M.D. (AR 663). While Plaintiff's MRI scan showed severe degenerative disk disease at L4-5, Dr. Decky stated that he "certainly . . . would not recommend any surgical intervention" at that time. (AR 664). Similarly, on June 29, 2010, Dr. Deckey declined to "recommend any surgical intervention," but recommended instead "a course of epidurals as well as core

strengthening." (AR 665). On September 8, 2011, Plaintiff reported to Dr. Deckey that she has "severe pain" on a daily basis and that her two most recent epidural injections "did not help." (AR 670). Plaintiff informed Dr. Deckey that she "wishe[d] to proceed toward surgery." (AR 671).

Dr. Deckey performed cervical spinal (neck) fusion surgery on Plaintiff on December 5, 2011, her claimed disability onset date. (AR 396, 522). Plaintiff was discharged the following day. (AR 406). On December 20, 2011, Dr. Deckey reported that Plaintiff's "anterior incision [was well healed" and that "there are no signs of infection." (AR 326). On January 16, 2012, Plaintiff reported to her primary care physician that her arm numbness had "resolved" and that she was taking a muscle relaxant for the post-surgery pain in the back of her head. (AR 301).

The next day, on January 17, 2012, Dr. Deckey reported that Plaintiff was "doing extremely well" and that the "fusion is consolidating." (AR 323). On March 6, 2012, Dr. Deckey observed that Plaintiff's "neck [was] improving," even though the fusion was "not 100% healed." (AR 321). Nonetheless, on June 5, 2012, Dr. Deckey determined that Plaintiff's neck appeared to be "doing reasonably well." (AR 683).

On July 17, 2012, Physician's Assistant Jason R. Cook observed that Plaintiff was "doing very well with regard to her cervical spine," but that she complained of lower back pain. (AR 508). On August 14, 2012, Dr. Deckey reported that Plaintiff has "good

overall alignment" and that she "is actually doing fairly well with regard to her neck." (AR 505). Dr. Deckey recommended that Plaintiff see Dr. Albert Lai for pain management. (AR 506).

On February 14, 2013, Mr. Cook noted that although Plaintiff stated that she had "some persistent neck pain, she denies any radicular type symptoms." (AR 583). On February 19, 2013, upon reviewing the results of the CT scan, Mr. Cook noted that Plaintiff had pseudarthroses at the C5-C6 bone graft, (AR 586), but not at the C4-C5 and the C6-C7 disc levels. (AR 598). On June 25, 2013, Mr. Cook noted that Plaintiff "appear[ed] to have consolidation of her fusion and bone healing at C5-6." (AR 694).

### 4. Diverticulitis

On January 27, 2012, Dr. Tackson Tam treated Plaintiff for an episode of diverticulitis, noting that because this was Plaintiff's "3d attack, she should consider surgery in [the] near future." (AR 340). Plaintiff was advised to go on a clear liquid diet and began medication (Cipro and Flagyl) "for better control." (AR 340). On February 3, 2012, Plaintiff was "much improved" and was "advancing her diet" to include more fiber. (AR 337). On February 22, 2012, Plaintiff reported to St. Joseph's Hospital for a pre-op visit, stating that her "pain was almost gone." (AR 425). On March 1, 2012, gastroenterologist Dr. Haig Najarian, M.D. gave a second opinion concurring with the decision to operate given that Plaintiff had had "multiple bouts of diverticulitis at [a] younger age." (AR 371).

On March 13, 2012, Dr. Theodore Coutsoftides, M.D., performed a laparascopic sigmoid resection with colorectal anastomosis.[13] (AR 419-22; see also AR 383-84). On March 26, 2012, Dr. Coutsoftides noted that the surgical incision was "healing well without any infection or herniation" and that Plaintiff was "doing well and has no complaints." (AR 414). On April 12, 2012, Plaintiff's midline incision was "well healed," there was "no hernia," and Plaintiff was in "no acute distress." (AR 413). Plaintiff was given a booklet on a high fiber diet. (Id.). On June 7, 2012, Plaintiff was "stable and doing well," with "minimal incisional tenderness." (AR 410).

Two years later, on July 17, 2014, Plaintiff presented to Dr. Shahram Javaheri, M.D., complaining of "severe abdominal pain" that she thought might be a recurrence of diverticulitis. (AR 1106). Dr. Javaheri noted that Plaintiff "seem[ed] to be in mild pain," (AR 1107), and concluded that he was "not sure if she has diverticulitis." (AR 1108). Dr. Javaheri advised Plaintiff to complete her course of antibiotics and ordered additional tests. (Id.).

---

[13] A laparascope is a "rigid endoscope that is inserted through an incision in the abdominal wall and is used to examine visually the interior of the peritoneal cavity." (See http://c.merriam-webster.com/medlineplus/laparoscope). The sigmoid colon is "the contracted and crooked part of the colon immediately above the rectum." (See http://c.merriam-webster.com/medlineplus/sigmoid). Anastomosis is "the surgical union of parts and especially hollow tubular parts." (See http://c.merriam-webster.com/medlineplus/anastomosis). Plaintiff refers to this in her testimony.

### 5.   Carpal Tunnel Syndrome

On August 14, 2012, Plaintiff consulted with Dr. Mark Halikis, M.D. after an "EMG" test demonstrated "moderate carpal tunnel syndrome."[14] (AR 505). On August 20, 2012, Dr. Halikis noted that Plaintiff's right hand was "tender" at her MP joint of the thumb and "nontender" at the CMC joint and the A1 pulley. (AR 630). Plaintiff's left wrist showed a good range of motion. (Id.). Dr. Halikis diagnosed Plaintiff with "bilateral carpal tunnel syndrome, moderate," with arthrosis in her right thumb MP joint and left wrist. (Id.). Dr. Halikis explained to Plaintiff that "none of these problems have to be treated urgently" and that she is "not really looking towards surgery in the near future." (AR 630-31). Dr. Halikis gave her injections in her bilateral carpal canals and prescribed a splint and a topical gel. (AR 631).

On September 17, 2012, Dr. Halikis informed Plaintiff that surgery on her right hand "would likely give her good relief" and gave her an injection in her left hand "not for the carpal tunnel, but for the arthrosis itself." (AR 632). On October 15, 2012, Plaintiff reported that she was "doing well," including "quite well" in her right hand and "fairly well" in her left. (AR 634). On December 5, 2012, Dr. Halikis stated that Plaintiff's injections

---

[14] An EMG test "studies nerve conductions (by delivering electrical impulses to the nerves) and muscles (by inserting a needle probe into different muscles)" and is considered a "useful and sensitive test for carpal tunnel syndrome." (See https://teleemg.com/carpal-tunnel-ulnar-nerve-symptoms-forum/).

were "holding her up okay" on her right side, but that the results on the left side were "transient." (AR 636).

On January 9, 2013, Plaintiff decided to undergo an "ulnar shortening osteoplasty as well as excision of the ossicles in the left wrist." (AR 638). Dr. Halikis performed the osteoplasty on February 26, 2013. (AR 643). On March 4, 2013, Plaintiff's "wounds look well healed," and her x-rays showed "good placement of the plate, good apposition of the osteotomy site, and debridement of the wrist." (AR 640). Plaintiff reported "significant discomfort," but Dr. Halikis referred her to her pain management doctor. (Id.). On March 4, 2013, Plaintiff's wounds were "well healed" and Plaintiff had "minimal swelling." (AR 830). On March 25, 2013, Plaintiff was out of her cast and was sent to therapy to start on "splinting and rehabilitation." (AR 641). On April 22, 2013, Plaintiff was "making good gains in therapy" and her x-rays showed "excellent progress in healing." (AR 806). On May 20, 2013, Plaintiff evidenced "some improvement," but also complained of "a generalized reaction of the surgical procedure which goes beyond what [Dr. Halikis] did." (AR 787). Dr. Halikis recommended that Plaintiff "continue therapy and introduce the element of stress loading" into the therapy. (Id.).

On June 17, 2013, Dr. Halikis told Plaintiff that "she needs to get into therapy at least once a week," and that even though "that is a problem for her, . . . . [if] she wants to move along, she needs to get on it." (AR 776). On July 15, 2013, Dr. Halikis noted that Plaintiff had been attending therapy and her

functionality had "increased significantly." (AR 758). On September 16, 2013, Dr. Halikis reported that at Plaintiff's "[l]ast visit we explained to her that we did not have much else to offer," once again told her "that there is not much more for [him] to do." (AR 743).

### 6. Pain Management

On September 20, 2012, Plaintiff consulted Dr. Albert Lai, M.D. for pain management. (AR 1027). Plaintiff complained of constant pain in her back, bones, and joints and rated the degree of pain a "seven" on a scale of zero to ten. (AR 1028). Dr. Lai prescribed a "medial branch block" and gave her a right heel lift. (AR 1030). On October 19, 2012, Plaintiff received an injection to manage pain in her lower back and both hands. (AR 1020). On October 23, 2012, Plaintiff reported that there was no change in her pain level after the October 19 injection. (AR 1019). On November 8, 2012, Plaintiff stated that the shoe lift seemed to help her walk straighter, and that the medications were helping. (AR 1014). Dr. Lai observed that Plaintiff was ambulatory without an assistive device and was not in "apparent distress." (AR 1016).

On December 7, 2012, Dr. Lai prescribed Soma for pain management and administered an injection. (AR 608, 1008-10). On December 13, 2012, Plaintiff reported that her pain level had improved. (AR 610, 1007). Nonetheless, on January 3, 2013, Plaintiff complained that her pain interfered with her concentration and mood "sometimes," and with her family function

and recreation "a lot." (AR 612). However, Dr. Lai noted that Plaintiff did not appear to be in any stress, (AR 613), and Plaintiff admitted that the medications "are helping" and did not cause any side effects. (AR 614). Plaintiff received an injection on February 1, 2013, and reported that her condition had improved. (AR 619). However, on both February 21 and March 21, 2013, Plaintiff stated that her pain level had not changed since her last visit and that her "medications are less effective." (AR 620, 989).

On April 11 and May 16, 2013, Plaintiff reported that her pain levels had decreased since the last visit. (AR 981, 985). On June 21, 2013, a lumbar epidurogram showed "adequate flow into the epidural space," with no "filling defects," and Plaintiff continued to report that medications were helping. (AR 979). On August 22, 2013, Plaintiff stated that her pain level had increased since her prior visit on July 30, 2013 (AR 974), but once again admitted that "medications are helping." (AR 969). On September 27, 2013, Plaintiff received an injection to treat sacroiliac joint pain. (AR 960, 962). On October 31, 2013, Plaintiff complained to Dr. Lai that while her pain medications were "helpful," they did not alleviate the pain entirely. (AR 954).

7. **Arthritis**

On October 8, 2012, Plaintiff consulted with Dr. Joo-Hyng Lee, M.D. regarding joint pain. (AR 724). Dr. Lee explained to Plaintiff that he "did not feel that she had an underlying

17

connective tissue disorder." (AR 726). In a follow-up visit on November 5, 2012, Dr. Lee reported that Plaintiff's upper and lower extremities were "normal" and that Plaintiff has "no current signs of rheumatoid arthritis," even though she did have "a low positive rheumatoid factor." (AR 730). On January 29, 2013, Dr. Lee reported that the MRI of Plaintiff's hands revealed "no indication of any inflammatory arthritis currently." (AR 736).

### 8. Ventral Hernia

On January 27, 2014, Plaintiff had a ventral hernia operation. (AR 1038). A physician's assistant reported on February 3, 2014, that Plaintiff was "doing well postoperatively" with "no obstruction." (Id. 1033). On April 3, 2014, Plaintiff informed Dr. Wagner that she had had "no major complications" and "no bleeding episodes" from the hernia operation. (AR 1044).

### 9. Depression

Plaintiff saw psychotherapist Anne Laptin, M.S., LCSW, for a total of seven sessions between October and December 2012. (AR 1092). Ms. Laptin wrote a letter on April 30, 2014 stating that Plaintiff had presented with signs of depression. (Id.). Ms. Laptin diagnosed Plaintiff with Depressive Disorder Due to a Medical Condition, and noted that while Plaintiff "showed mild improvement" over the course of their sessions, the "extensive focus on her medical needs, appointments and pain management made it difficult to reduce her symptoms in a significant way in the

time we worked together." (Id.).  At the same time that Plaintiff was seeing Ms. Laptin, she also had several visits with psychiatrist Susan Zachariah, M.D.  (AR 1081-83).  Plaintiff's initial visit with Dr. Zachariah appears to have been on October 23, 2012.  (AR 1081).  Plaintiff complained of feeling sad, anxious and overwhelmed.  (Id.).  However, Dr. Zachariah noted that Plaintiff's insight and judgment were intact, as was her memory for recent and remote events.  (AR 1083).  On November 27, 2012, Plaintiff stated that she was "doing much better" and felt "less depressed and less anxious."  (AR 1082).  On January 7, 2013, Dr. Zachariah determined that Plaintiff was "anxious and mildly depressed" and planned to take her off of Cymbalta.  (AR 1084).

In addition to Ms. Laptin and Dr. Zachariah, many of Plaintiff's treating physicians assessed Plaintiff's mental condition.  They typically described her general mental status in positive terms, even as they acknowledged that she presented with some level of depression.  (See, e.g., AR 331 (3/9/12, "Oriented to person, place, time and general circumstances.  Mood and affect appropriate."); AR 371 (4/19/12, "oriented to time, place, person, and situation" demonstrating "appropriate affect and mood"); AR 1042 (12/4/13, "alert and oriented, no acute distress"); AR 1053 (3/26/14, "good energy level"); AR 1050 (4/9/14, mental status alert, without anxiety or fear)).

## D.   **Non-Examining Physicians**

### 1.   **Dr. M. Yee, M.D.**

On June 22, 2012, Dr. M. Yee provided a Disability Determination Explanation based on his review of Plaintiff's medical records. (AR 63). Dr. Yee assessed Plaintiff's Residual Functional Capacity for the first twelve months after her alleged disability onset date, i.e., between December 5, 2011 and December 5, 2012. (AR 69). Dr. Yee determined that Plaintiff had four severe impairments: (1) "Disorders of Back -- Discogenic and Degenerative," (2) "Disorders of Gastrointestinal System," (3) diabetes, and (4) anemia. (AR 68). Dr. Yee concluded that although Plaintiff had exertional limitations, she would be able to: lift ten pounds occasionally; less than ten pounds frequently; stand for two hours and sit for six hours in a normal eight-hour workday; climb ramps or stairs, stoop (bend at the waist), crouch (bend at the knees), kneel and crawl occasionally, but never climb ladders, ropes or scaffolds. (AR 69-70). Dr. Yee further found that Plaintiff should "avoid concentrated exposure" to hazards such as "machinery, heights, etc.," but that she had no manipulative, visual or communicative limitations. (AR 70-71). With these limitations, Dr. Yee determined that Plaintiff could perform her past relevant work as an Order Clerk, DOT Code 249.362-026, and was therefore not disabled. (AR 72).

**2.  Dr. R. Weeks**

On May 28, 2013, Dr. R. Weeks provided a Disability Determination Explanation based on his review of Plaintiff's medical records, which he divided into two periods. (AR 76). The first period overlapped with Dr. Yee's assessment, and continued for approximately three months longer, i.e., from December 5, 2011 to February 25, 2013. (AR 85). The second period covered February 26, 2013 through February 26, 2014. (AR 87).

For the period between December 5, 2011 and February 25, 2013, Dr. Weeks determined that Plaintiff had the same four severe impairments identified by Dr. Yee -- (1) "Disorders of Back -- Discogenic and Degenerative," (2) "Disorders of Gastrointestinal System," (3) diabetes, and (4) anemia -- and added a fifth, (5) peripheral neuropathy. (AR 84). Also like Dr. Yee, Dr. Weeks found that Plaintiff would be able to:  lift ten pounds occasionally; less than ten pounds frequently; stand for two hours and sit for six hours in a normal eight-hour workday; climb ramps or stairs, stoop (bend at the waist), crouch (bend at the knees), kneel and crawl occasionally, but never climb ladders, ropes or scaffolds. (AR 85-86).

However, unlike Dr. Yee, Dr. Weeks determined that Plaintiff had manipulative limitations in that she had a "limited" ability to reach overhead with either arm and to handle or "finger" items (gross and fine manipulation). (AR 86). Dr. Weeks also found that Plaintiff's environmental limitations included not just the need

21

to avoid concentrated exposure to hazards like machinery and heights, but also to extreme cold and vibration. (AR 87).

For the period between February 26, 2013 through February 26, 2014, Dr. Weeks assessed an RFC that was nearly identical to his RFC assessment for the earlier period, with the following two differences: for the latter period, Dr. Weeks concluded that Plaintiff could "never" crawl, (AR 88), instead of "occasionally" crawl; and that her gross manipulation ability was "unlimited," (id.), instead of "limited". (Id.). With these limitations, Dr. Weeks determined that Plaintiff could perform her past relevant work as an Order Clerk, DOT Code 249.362-026, and was therefore not disabled.

### 3. Dr. Malcolm Brahms

Impartial Medical Expert Dr. Malcolm Brahms testified at the ALJ hearing on May 21, 2014. (AR 42-48). Dr. Brahms stated that the record reflects that Plaintiff is a "diabetic, slightly obese individual who has a series of problems." (AR 43). These problems include "a cervical spine problem, shoulder problems, carpal tunnel syndrome," thrombocytopenia, diabetes, neuropathy, pain, pseudoarthrosis, and cavovarus foot with related ankle problems.[15] (Id.). Dr. Brahms stated that because of Plaintiff's cervical spine issues, she should "avoid any work above shoulder level" and

---

[15] "Cavovarus foot refers to a foot that has both cavus (high arch) and varus of the heel (a heel that is turned inward)." (See http://www.aofas.org/PRC/conditions/Pages/Conditions/Cavovarus-Foot.aspx).

"avoid repetitive lifting below waist level," _i.e._, bending to lift, although she could engage in below waist level lifting "occasionally." (AR 46). Because of Plaintiff's feet and ankle issues, Dr. Brahms stated that Plaintiff could engage in "limited walking" for short distances at a time. (AR 46).

## IV.

## THE FIVE STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents the claimant from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)     Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

23

(2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5) Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his or her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work

experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 28).  At step one, the ALJ found that Plaintiff met the insured status requirements through March 31, 2017 and had not engaged in substantial gainful activity since December 5, 2011, the alleged disability onset date.  (AR 18).  At step two, the ALJ found that Plaintiff had the severe medically determinable impairments of slight obesity; diabetes mellitus; degenerative disc disease of the cervical spine, status post laminectomy[16] and fusion in December 2011 with suggestion of pseudoarthrosis at the C5-6 graft line; bilateral carpal tunnel

---

[16] A laminectomy is the "surgical removal of the posterior arch of a vertebra (as to relieve compression of a spinal nerve root)." (<u>See</u> http://c.merriam-webster.com/medlineplus/laminectomy).

syndrome; degenerative disc disease and stenosis of the lumbar spine; status post left ulnar shortening osteoplasty in February 2013; anemia; peripheral neuropathy; and chronic thrombocytopenia. (Id.).

At step three, the ALJ found that the severe impairments at step two did not meet or medically equal a listed impairment. (AR 20). The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.156(a),[17] except: can sit for six hours out of an 8-hour day; stand or walk 2 hours out of an 8-hour days with normal workday breaks; occasionally life and carry 10 pounds, frequently lift and carry less than 10 pounds; both lower extremities no bending over to lift from below the waist; occasional stairs, bending, balancing, stopping, crouching, crawling, kneeling; no ladders, ropes or scaffolding; frequent gross and fine manipulation with both upper extremities; no work above shoulder level with both upper extremities; and no unprotected heights, dangerous or fast moving machinery. (AR 22). At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a secretary and office manager, which do not require the performance of work-related activities precluded by Plaintiff's RFC. (AR 27). Accordingly, the ALJ found that Plaintiff was not under a

---

[17] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." See 20 C.F.R. § 404.1567(a).

disability as defined by the Social Security Act from December 5, 2011, the alleged onset date of her disability, to the date of the ALJ's decision. (AR 28).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "[The] court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." (Id.). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-

27

21 (citing <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### THE ALJ'S REASONS FOR REJECTING PLAINTIFF'S SUBJECTIVE TESTIMONY WERE SPECIFIC, CLEAR AND CONVINCING

Plaintiff challenges the ALJ's decision on the sole ground that the ALJ improperly assessed Plaintiff's credibility. (Plaintiff's Memorandum in Support of Complaint ("P Memo.") at 3). Plaintiff first contends that the ALJ improperly used boilerplate language in finding her to be not entirely credible. (P Memo. at 6). Second, Plaintiff argues that the ALJ's reliance on the purported lack of objective medical evidence to support her subjective claims of pain "is always legally insufficient" because in <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345-46 (9th Cir. 1991), the Ninth Circuit rejected a standard that would require objective evidence to prove the degree of such an impairment. (P Memo. at 6-9). According to Plaintiff, to find her testimony not credible, the ALJ may only, but did not, "'rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between her testimony and her own conduct, or on internal contradictions in that testimony.'" (<u>Id.</u> at 8) (quoting <u>Light v. Comm'r Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997) ("In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An

ALJ may not discredit a claimant's subjective testimony on that basis.")).

The ALJ generally contended that "the evidence submitted does not support the severity of symptoms alleged," (AR 26), and provided four primary reasons for finding that Plaintiff's testimony regarding her symptoms and limitations was "not entirely credible," (AR 23):   (1) Plaintiff's "generally successful" treatment history; (2) her failure to follow up on recommendations made by her doctors; (3) inconsistencies between her testimony and objective medical evidence, (AR 26-27), and (4) discrepancies between Plaintiff's activities of daily living and her allegations of depression.[18]   (AR 19-20).   The ALJ's first, third and fourth reasons for rejecting Plaintiff's credibility were specific, clear, and convincing.   To the extent that the evidence cited in support of the second reason did not support the ALJ's conclusion, the error was harmless.   Accordingly, for the reasons discussed below, the ALJ's decision is AFFIRMED.

**A.   <u>Standard</u>**

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step

_____

[18] The ALJ's discussion of the discrepancy between Plaintiff's allegations of depression and her activities of daily living was in the context of a lengthy discussion of whether Plaintiff's mental condition was a severe impairment.   (See AR 19-20).   The ALJ concluded that despite Plaintiff's claims, her mental impairment was "nonsevere."   (AR 20).

analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

Initially, the ALJ must determine if there is medical evidence of

an impairment that could reasonably produce the symptoms alleged.

Id. (citation omitted).  If such evidence exists, and there is no

evidence of malingering, the ALJ must provide specific, clear and

convincing reasons for rejecting the claimant's testimony about

the symptom severity.  Id. (citation omitted); see also Smolen, 80

F.3d at 1284 ("[T]he ALJ may reject the claimant's testimony

regarding the severity of her symptoms only if he makes specific

findings stating clear and convincing reasons for doing so.").  In

so doing, the ALJ may consider the following:


> (1) ordinary techniques of credibility evaluation, such
> as the claimant's reputation for lying, prior
> inconsistent statements concerning the symptoms, and
> other testimony by the claimant that appears less than
> candid; (2) unexplained or inadequately explained
> failure to seek treatment or to follow a prescribed
> course of treatment; and (3) the claimant's daily
> activities.


Id.; see also Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir.

2008).  Inconsistencies between a claimant's testimony and conduct,

or internal contradictions in the claimant's testimony, also may

be relevant.  Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th

Cir. 1997).  In addition, the ALJ may consider the observations of

treating and examining physicians regarding, among other matters,

the functional restrictions caused by the claimant's symptoms.

Smolen, 80 F.3d at 1284. It is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citing Bunnell, 947 F.2d at 345).

Further, the ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the claimant's] testimony." Tommasetti, 533 F.3d at 1039 (citation omitted). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing Fair, 885 F.2d at 604).

## B. **Factors Supporting The ALJ's Adverse Credibility Determination**

The ALJ provided two specific, clear and convincing reasons to find Plaintiff's complaints of constant, all-consuming pain not fully credible. (AR 26-27). These reasons are sufficient to support the Commissioner's decision.

### 1. **Successful Treatment History**

The ALJ found Plaintiff not entirely credible because even though Plaintiff sought treatment for medical treatment for her

31

symptoms, the treatment was "generally successful in controlling those symptoms," which Plaintiff's complaints of constant, debilitating pain do not acknowledge. (AR 26). For example, the ALJ explained that after Plaintiff underwent neck fusion surgery on December 5, 2011 to treat cervical degenerative disc disease, by "January 2012, her arm numbness had resolved and she was reportedly doing extremely well. Physical examination revealed motor and sensory exam was grossly within normal limits; subsequent examinations revealed her pain was well controlled with medication[.]" (Id.). The record amply supports the ALJ's observations. For example, Plaintiff's surgeon, Dr. Deckey, reported on January 17, 2012 that Plaintiff was "doing extremely well," and on June 5, 2012, that she was doing "reasonably well." (AR 323, 683). Physician's Assistant Mr. Cook observed on July 17, 2012 that Plaintiff was "doing very well with regard to her cervical spine." (AR 508).

Similarly, the ALJ noted that Plaintiff's thrombocytopenia significantly improved with treatment. (AR 26). The record shows that on November 3, 2011, Dr. Byun cleared Plaintiff for her neck surgery, noting that "[c]urrently the patient is feeling well," (AR 486), and on August 7, 2012, Dr. Byun cleared Plaintiff for carpal tunnel surgery, noting that in light of her current platelet counts, Plaintiff should be able to tolerate the surgery without increased risk of bleeding complications. (AR 485). In December 2013, Dr. Wagner also cleared Plaintiff for hernia surgery. (AR 1052). Finally, the ALJ noted that Plaintiff's diverticulitis responded well to her sigmoid colon resection in March 2012. (Id.).

Indeed, in a follow up visit on March 26, 2012, Dr. Coutsoftides reported that Plaintiff "was doing well and has no complaints." (AR 414; see also AR 413 (April 12, 2012, reporting that Plaintiff "is experiencing no new medical problems or complaints"); AR 410 (June 7, 2012, reporting same)).

The ALJ properly could infer, on the basis of ample medical evidence demonstrating that Plaintiff was doing well after her successful procedures, that Plaintiff's testimony regarding her degree of pain was exaggerated and not credible.

### 2. Inconsistencies Between Plaintiff's Testimony And Objective Medical Evidence

The ALJ found Plaintiff's credibility diminished based on inconsistencies between her testimony describing her pain as "debilitating" and "unrelenting," (AR 41, 53), and the objective medical evidence. (AR 26). Specifically, the ALJ observed that Plaintiff's claims were inconsistent with her physical examination with Dr. Wagner in December 2013. According to the ALJ, that examination "revealed normal strength and tone in both upper and lower extremities, intact neurological findings, normal gait, no memory impairment, and normal affect." (AR 26) (citing AR 1048-52). The ALJ further noted that "Dr. Wagner concluded there was no need for any treatment (unless the platelet count dropped) in an April 2014 follow-up visit and advised the claimant to return in nine months for re-evaluation." (AR 26-27) (citing AR 1044-47). The ALJ noted that, despite Plaintiff's claims of depression

and sleep disturbance, her "neurological and mental status examinations have been described as normal on numerous occasions by her treating physicians." (AR 27). The record supports the ALJ's observations. (See, e.g., AR 331, 371, 1042, 1050, 1053).

Furthermore, there is a contradiction between Plaintiff's claims of debilitating, constant pain and her own repeated reported admissions to Dr. Lai that her pain levels improved under his care. (See, e.g., AR 610 (12/13/12, pain level "improved" following injection and prescription to Soma); AR 614 (1/3/13, medications "are helping" and do not cause side effects); AR 619 (2/13/13, condition "improved" after injection on February 1, 2013); AR 981 (4/11/13, pain levels decreased); AR 985 (5/16/13, pain levels decreased); AR 969 (medications are "helping"); AR 954 (medications are "helpful," but do not entirely alleviate pain); AR 950 (12/5/13, medications are "helping"). In addition, Plaintiff admitted that she is able to do housework every day so long as it does not involve bending, and that she begins each day by exercising for twenty-five to forty minutes. (AR 526).

The inconsistencies between Plaintiff's testimony and the objective medical evidence constituted a clear and convincing reason for the ALJ's adverse credibility determination. Cf. Light, 119 F.3d at 792; see also Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010) (ALJ properly "concluded that [claimant] was not entirely credible because he found contradictions between complaints in [plaintiff's] activity questionnaire and hearing testimony and some of his other self-reported activities).

### 3. Discrepancies Between Allegations Of Depression And Activities Of Daily Living

An ALJ may consider the claimant's daily activities in weighing credibility. <u>Tommasetti</u>, 533 F.3d at 1039 (citing <u>Smolen</u>, 80 F.3d at 1284). Here, the ALJ determined that despite Plaintiff's allegations of depression, her mental impairment was nonsevere. (AR 19-20). The ALJ concluded that Plaintiff had only mild limitations in her "activities of daily living": "There is no evidence that [Plaintiff] is unable to perform personal grooming, manage funds, drive or go out alone, or shop for groceries." (AR 19). Similarly, the ALJ concluded that Plaintiff had only mild limitations in her social functioning: "[Plaintiff] is married and lives with her husband and teenage son; there is no evidence of any problems getting along with family members, friends, or neighbors; she has not alleged any problems getting along with supervisors or coworkers." (<u>Id.</u>). The ALJ noted that Plaintiff also had only mild limitations in concentration, persistence or pace, as the evidence showed that she is able to "focus attention during evaluations," presents with a normal affect, and had no impairment in memory. (AR 20). Indeed, the record shows that Plaintiff exercises, cleans, cooks, and interacts with her husband and son on a daily basis. (AR 526-31). The discrepancy between Plaintiff's alleged depression and her daily activities supports the ALJ's determination that Plaintiff is not entirely credible.

**C.**  **The Example Cited By The ALJ To Support Her Contention That Plaintiff Did Not Follow Her Providers' Recommendations Appears Erroneous, But Is Harmless**

The ALJ also found Plaintiff not credible in part because she had allegedly failed to "follow up on recommendations made by her treating doctors," which "suggests that the symptoms may not have been as serious as [Plaintiff] alleged" in her disability application. (AR 26). A claimant's refusal to follow a recommended course of treatment supports a finding that the claimant is not fully credible. See 20 C.F.R. §§ 404.1530(a) and 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. §§ 404.1530(b) and 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."); see also Molina, 674 F.3d at 1113 (a claimant's statements may be less than credible if the medical records "show that the [claimant] is not following the treatment as prescribed and there are no good reasons for this failure.") (quoting SSR 96-7p).

The ALJ based her conclusion that Plaintiff was noncompliant on a single, specific example:

> The record reveals that the claimant failed to follow-up on recommendations made by her treating doctors, and has been noncompliant with her prescribed treatment and medications . . . . For instance, the claimant has been

diagnosed with type II diabetes mellitus for which she
has been prescribed multiple medications. Although the
claimant's diabetes was reportedly uncontrolled in May
2014, she had been off insulin for a while (Exhibit
32F/s). Prior to that, Dr. Geier, the claimant's
endocrinologist, consistently noted her diabetes had
been well controlled with medications (Exhibit 34F).
The claimant's credibility is diminished because of
these inconsistencies.

(AR 26) (some internal record citations omitted).

The specific records cited by the ALJ as do not support the
contention that Plaintiff's diabetes was uncontrolled in May 2014,
and suggest that the reason she was no longer taking insulin was
because it was no longer prescribed. (See AR 26). However, even
if this particular example cited in the ALJ's credibility finding
was factually unsupported, the error was harmless.

To support the proposition that Plaintiff's diabetes was
uncontrolled in May 2014, the ALJ cited a May 2, 2014 medical
record drafted by Physician's Assistant Kelly Fee. (Id.). The
record reflects that the purpose of the visit was to "discuss
medication." (AR 1076). Ms. Lee wrote:

> [Plaintiff] saw Dr. Geier last week and the A1c was in
> the 6s.[19]  She has been off of insulin and has lost 30
> lbs.  Dr. Geier is retiring and she would like to get
> the medications through us for now.

(Id.) (footnote added).  Prior to seeing Dr. Geier, Plaintiff had a blood draw on April 2, 2014. (AR 1088).  The lab report indicates that her A1c was 6.5.  (Id.).  The lab report states:  "According to ADA guidelines, hemoglobin A1c <7.0% [less than 7.0%] represents optimal control in non-pregnant diabetic patients."  (Id.). Furthermore, Dr. Geier's handwritten record of the April 25, 2014 consult with Plaintiff, to which the ALJ cites, plainly states: "Type II diabetes [with] good control."[20]  (AR 1085).  Accordingly, the reference in the May 2, 2014 record to Plaintiff's A1c being in the 6's appears to indicate that her diabetes was in good control, not uncontrolled.[21]

\\

\\

---

[19] An A1c test "shows how well [a diabetic patient's] blood sugar levels have been controlled over a three-month period."  (See http://c.merriam-webster.com/medlineplus/A1c).

[20] The symbol Dr. Geier used in this record, a "c" with a line over it, stands for "with."  (AR 1085; see also http://www.newhealthadvisor.com/C-with-a-Line-over-It.html (" 'c' with a line over it is synonymous to 'with.'")).

[21] The Court acknowledges that the ICD-9 code used to describe Plaintiff's diabetes in the list of "active problems" in the May 2, 2014 medical record was 250.02, which is used for "diabetes type II, uncontrolled."  (AR 1076).  However, as explained in this section, the record evidence shows that Plaintiff's control of her diabetes between December 2013 and May 2014 was "good."

Additionally, the fact that Plaintiff was no longer taking insulin did not necessarily mean that she was not following her providers' recommendations. Dr. Geier's record for December 14, 2013, indicated that Plaintiff's diabetes was being treated with oral medications and "insulin therapy," with good control. (AR 1087). However, that same record indicates that Plaintiff's diabetes "therapy was adjusted to Actos 30mg, Nesina 25mg, and Glumetza 1000mg." (Id.). The list of medications to which Plaintiff's treatment was "adjusted" did not include insulin. Furthermore, Dr. Geier's notes for the April 25, 2014 consult state "continue oral therapy." (AR 1085). It therefore appears that Plaintiff was not taking insulin any longer in May 2014 because it was no longer part of her diabetic therapy. Notably, even though the May 2, 2014 record cited by the ALJ indicates that the purpose of the visit was to discuss Plaintiff's medications, insulin is not included in the list Plaintiff's current medications and was not prescribed. (AR 1077).

An invalid reason cited in support of an adverse credibility finding does not require remand if the ALJ's reliance on that reason was harmless error. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195-97 (9th Cir. 2004) (applying harmless error standard where one of the ALJ's several reasons supporting an adverse credibility finding was held invalid)). As the Ninth Circuit has explained,

\\

\\

[R]eviewing the ALJ's credibility determination <u>where</u>
<u>the ALJ provides specific reasons supporting such</u> is a
substantive analysis. So long as there remains
"substantial evidence supporting the ALJ's conclusions
on . . . credibility" and the error "does not negate the
validity of the ALJ's ultimate [credibility]
conclusion," such is deemed harmless and does not
warrant reversal. [<u>Batson</u>, 359 F.3d at 1197]; <u>see also</u>
[<u>Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050,
1055 (9th Cir. 2006)] (defining harmless error as such
error that is "inconsequential to the ultimate
nondisability determination").

<u>Carmickle</u>, 533 F.3d at 1162. "[T]he relevant inquiry in this
context is not whether the ALJ would have made a different decision
absent any error, it is whether the ALJ's decision remains legally
valid, despite such error." <u>Id.</u> (internal citation omitted).

Here, the specific example chosen by the ALJ in support of
the contention that Plaintiff was noncompliant appears to have been
based on an erroneous reading of the record. However, whether or
not Plaintiff was compliant with her providers' recommendations is
not essential to the ALJ's ultimate determination that Plaintiff's
claims of debilitating pain were not entirely credible. The ALJ's
other reasons, amply supported by evidence in the record, support
the ALJ's conclusion. Accordingly, to the extent that the ALJ's
reading of the May 2, 2014 record was erroneous, the error was
harmless.

In sum, the ALJ offered clear and convincing reasons, supported by substantial evidence in the record, for her adverse credibility findings. Accordingly, because substantial evidence supports the ALJ's assessment of Plaintiff's credibility, no remand is required.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: June 14, 2017

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER LEGAL DATABASE.**